No. 44,187

ARZELA SEXTON CARRY, Executrix of the Estate of Laura Estella Sexton, Deceased, *Appellant,* v. W. O. HOMER, *Appellee;* (TOM GIVENS, CECILIA T. JONES, as the Executrix of the Last Will and Testament of Anna M. Jones, Deceased, and CECILIA T. JONES, Defendants).

(407 P. 2d 538)

Opinion filed November 6, 1965.

*Howard Harper,* of Junction City, argued the cause, and was on the brief for the appellant.

*Robert A. Schermerhorn,* of Junction City, argued the cause, and was on the brief for the appellee.

The opinion of the court was delivered by

O'CONNOR, J.: This was an action to cancel a real estate contract and for possession of the property involved. The original plaintiff in the action, Laura Estella Sexton, is now deceased. Her daughter, Arzela Sexton Carry, as executrix of her will, has been substituted as party plaintiff and will hereafter be referred to as the plaintiff. We will refer to the defendant W. O. Homer, the only appellee, as Homer, and the other defendant, Tom Givens, as Givens.

Trial was to the court without a jury. Judgment was entered canceling the contract and determining the amount due thereon. The defendant Homer, having obtained an assignment of all of Givens' interest in the contract after this action was begun, was given the right to redeem the subject real estate as a part of the court's order. From an order of the trial court overruling plaintiff's motion for new trial, she has appealed.

All parties agree the contract had been breached. The main dispute concerned the balance due on the contract at the time of its breach.

In order to fully understand the questions involved on appeal a detailed statement of facts is deemed necessary. On July 17, 1952, the plaintiff, acting by and through her husband and duly authorized agent, Harvey Sexton, sold a farm consisting of 425 acres to Givens for the sum of $60,000. The sale was evidenced by a written agreement which provided for a down payment of $10,000 and the balance payable in ten annual installments.

On December 11, 1953, Givens sold a portion of this same real estate to Homer for the sum of $33,101 with a down payment of $5,516 and the balance payable in ten annual installments. This sale was evidenced by a written agreement which named the plaintiff as a third party. The agreement contained a provision which provided that all installment payments were to be paid by Homer to Givens and the plaintiff jointly and were to be applied upon the balance due under the real estate contract dated July 17, 1952. Before the agreement was drafted the matter was discussed with the plaintiff's husband, Harvey Sexton. After the agreement had been executed by Givens and Homer, Givens and Homer's attorney took the agreement to Mr. Sexton for the purpose of securing the plaintiff's signature. Sexton read the agreement but refused to permit his wife to sign it. At that time Homer's attorney informed

Sexton that Homer would make the installment payments provided in the agreement by checks made payable jointly to Givens and Mrs. Sexton in order to be sure that Homer's payments were received by Mrs. Sexton.

On March 2, 1956, Given sold another portion of the real estate involved in the contract of July 17, 1952, to Homer for the sum of $21,000 with a down payment of $5,183.44 and the balance payable in eight annual installments. Again this sale was evidenced by a similar three-party agreement which named the plaintiff. The agreement contained a similar provision to that in the December 11, 1953, agreement regarding the installment payments by Homer to Givens and plaintiff jointly, and that they were to be applied to the balance due on the basic contract of July 17, 1952. This agreement was not signed by the plaintiff, and there is nothing in the record to indicate it was ever shown to the plaintiff or her husband.

From May 26, 1955, to March 7, 1961, Homer, by separate checks each made payable to Givens and Mrs. Sexton jointly, made seven payments on the amounts due on the contracts of December 11, 1953, and March 2, 1956. These checks were endorsed by Givens and deposited in the plaintiff's account in the Abilene National Bank. The payments made by Homer beginning March 2, 1956, were intended by him to be applied by the plaintiff to the balance due on the basic contract of July 17, 1952, between the plaintiff and Givens. During this same time Givens made additional payments to the plaintiff on his basic contract of July 17, 1952.

At the request of Givens $4,000 of the $6,629.69 payment made by Homer on March 2, 1956, was applied by the plaintiff to another debt owed her by Givens. Also at Givens' request $1,500 of the $4,500 payment made by Homer on March 1, 1958, was applied by plaintiff to another account owed her by Givens. Neither Givens nor the plaintiff informed Homer about the manner in which these two payments had been applied by the plaintiff until 1964.

On January 28, 1957, Homer drew a check in the sum of $1,431.94 payable to Harvey Sexton to cover delinquent taxes for the years 1953 through 1956 paid by Sexton on the land which Homer was purchasing from Givens. This check was delivered to Givens who in turn delivered it to Sexton. Although from the record it is not clear whether the delinquent taxes related to the real estate involved in both the contracts of December 11, 1953, and March 2, 1956, between Homer and Givens, it is noted that the contract of March

2, 1956, made Homer liable for all taxes and assessments on the real estate covered by said contract for 1955 and succeeding years.

On October 17, 1958, the plaintiff and Givens executed a written memorandum in the nature of an account stated in which it was acknowledged that as of that date the principal balance due under the basic contract of July 17, 1952, was the sum of $25,000. Homer was not a party thereto, nor did he have knowledge of the memorandum. It should be noted that the balance acknowledged in the memorandum as being due under the basic contract did not give Homer credit for the full payments made by him on March 2, 1956, and March 1, 1958.

After allowing Homer credit for the two payments which were not applied to the basic contract by the plaintiff, the trial court calculated the balance due on the basic contract between the plaintiff and Givens was the sum of $7,901.65. In its conclusions of law the court said:

"1. That the plaintiff, having actual knowledge by and through her agent Harvey Sexton of the sale of a part of the real estate covered by the basic contract between plaintiff and Givens by Givens to the defendant Homer under a written contract dated December 11, 1953, having been informed that the defendant Homer would make the payments required under the latter agreement by checks made payable to Givens and Sexton jointly which were to be applied to the basic contract, and having received such checks which were deposited in her bank account, could not apply such payments to any other obligation of Givens even though Givens had directed such application.

"2. Plaintiff's crediting of the sum of $5,500.00 derived from payments made by the defendant Homer to other obligations of the defendant Givens under the circumstances above-mentioned constitutes a fraudulent application of such payments and is illegal and void.

"3. The written memorandum dated October 17, 1958, and signed by Sexton and Givens constitutes an account stated which is only prima facie evidence of its correctness and may be set aside for fraud or mistake.

"4. The stated account set out in the memorandum dated October 17, 1958, was based upon an erroneous and fraudulent application of payments made by the defendant Homer and since Homer was not a party to this memorandum and had no knowledge of the facts upon which the alleged settlement was based he is not bound thereby.

"5. The two payments made by Homer on March 2, 1956, in the sum of $4,000.00 and on March 1, 1958, in the sum of $1,500.00 should be credited to the balance due under the basic contract between Sexton and Givens as of the respective dates of such payments as set out in Paragraph 9 of this decision.

"6. The defendant, W. O. Homer, shall have six (6) months from the date of this judgment within which to redeem the basic contract between

Sexton and Givens dated July 17, 1952, by paying to the Clerk of the District Court the sum of $7,901.65, with interest at 5% per annum from March 13, 1961."

On appeal there are two questions raised: (1) whether or not the plaintiff could apply a portion of two payments received by her from Homer to other indebtedness owed to the plaintiff by Givens, and (2) if the payments were misapplied, whether or not the memorandum agreement dated October 17, 1958, between the plaintiff and Givens, which determined the balance due on the basic contract without giving Homer full credit for the two payments in question, is binding upon Homer.

The plaintiff contends that the court erred in holding that under the foregoing facts the plaintiff could not apply portions of two payments received by her from Homer to other indebtedness owed her by Givens.

Both parties cite two Kansas cases dealing with the general subject of the right of a creditor to make application of payments.

The first case on which the plaintiff relies is *Presbyterian Church v. Santy*, 52 Kan. 462, 34 Pac. 974. In that case the church had employed a contractor to build a new sanctuary. The church trustees paid the contractor on his contract, and the contractor in turn paid a hardware company the sum of $200 which was more than the total amount of the materials furnished for the sanctuary. Neither the trustees nor the contractor gave any direction about how the money should be applied. The hardware company gave the contractor credit on his general account. The hardware company then filed a materialman's lien on the sanctuary and foreclosed. The trustees of the church claimed the money they paid the contractor should be applied to pay for the material that went into the building. The district court granted judgment in favor of the hardware company, and the case was affirmed on appeal. In the course of the opinion the court said:

". . . Nothing was said by Thompson [contractor] when the payment was made as to where the money came from, nor was any direction given by the trustees or by Thompson as to its application. . . . The facts disclosed merely show that the trustees made Thompson a payment on his contract, which, for anything that appears, he was free to use as he pleased —to pay to the hardware company, or anyone else he saw fit. . . . It is well settled, that where the debtor fails to direct the appropriation of a payment the creditor has the right to make it. (*King v. Sutton*, 42 Kas. 600 [22 Pac. 695])."

Plaintiff also contends that her position is bolstered by the holding of *Crane Co. v. Terminal Railway Co.*, 98 Kan. 336, 158 Pac. 59. In that case a contractor had a contract to build a railroad terminal at Wichita. The contractor gave a performance bond. The plumbing portion of the contract was sublet to one, Crombie. While the terminal building was being constructed Crane Company (materialman) furnished material to the plumbing subcontractor for other jobs. The contractor notified Crane Company when it made payments to the subcontractor Crombie. Crombie directed Crane Company as to the manner in which payments received by him from the contractor were to be applied. Some payments were applied to other indebtedness of the subcontractor to Crane Company for other jobs. When the terminal was completed Crane Company still had a debt due for materials furnished and used in the terminal building by the subcontractor and filed its lien and brought suit on the contractor's bond. Upon appeal to this court judgment was entered for Crane Company. Again this court recognized the general rule that a debtor has the right to direct the manner in which payment on his indebtedness shall be applied, and if no direction is given, the creditor may apply the payment as he desires. In the course of the opinion the court observed:

". . . In this case the contractor simply paid Crombie what it owed him. The payment was made without reservation to satisfy the contractor's own debt. Unconditional title to the money passed to Crombie and it became his, free from any right or equity in the contractor to control his use of it. He could pay his taxes or club dues with it or could pay such of his merchandise creditors as he desired. When Crombie deposited the money in the bank to his general account it lost its identity, and when he gave his check to the plaintiff and directed the plaintiff to apply the proceeds in a specific way the plaintiff had no choice with respect to its conduct. It was obliged to apply the money as directed. . . ." (p. 338.)

In the *Crane* case a number of cases from other jurisdictions were cited and carefully analyzed, but the court concluded those decisions were directly opposed to the holding of *Presbyterian Church v. Santy*, supra. For other cases in this state where the general rule set forth in the *Presbyterian* case and the *Crane* case was recognized and followed see *Edelblute v. Waddell & Reed, Inc.*, 171 Kan. 508, 233 P. 2d 757, and cases cited therein.

In their briefs both parties refer to a lengthy annotation regarding the right of a debtor who pays a creditor to control application of payments made by the latter to his creditor with proceeds of the original payment. In 41 A. L. R. 1297 (supplemented in 130

A. L. R. 198 and finally in 166 A. L. R. 641) the author recognizes there are two lines of authority on the subject. In 6 Williston on Contracts, § 1804, *et seq.*, (Rev. Ed.), Professor Williston thoroughly discusses the application of payments and interests of third persons.

The question involved here arises most frequently in mechanic's lien cases where a contractor, having received payment from the owner of the property, uses the proceeds to discharge another debt due from the contractor to the materialman.

In calling our attention to a number of cases in other jurisdictions in which the right of the owner to direct application of payment is dependent upon the knowledge or notice which a materialman has as to the source of the funds and the owner's intention as to that application, Homer cites *Modesto Lumber Co. v. Wylde,* 217 Cal. 421, 19 P. 2d 238. In that case a loan association issued checks made payable to materialmen and gave them to the contractor with instructions they be delivered to the materialmen in payment for materials furnished and used in the construction of the owner's house. The contractor delivered the checks but directed their application to his personal accounts. In an action by the materialmen to foreclose liens for claimed amounts due, judgment was entered for the owner. The court, in the course of its opinion, observed that the checks were made payable directly to the loan association and not to the contractor, and thus, the materialmen had a duty to inquire of the loan association as to the manner in which the funds were to be applied. The court further pointed out:

"The majority rule seems to be that where the materialman is furnishing at the same time materials to a contractor for the construction of buildings upon the property of different owners, the materialman may, in the absence of notice of the source of the funds, accept the same from the contractor and apply them upon any agreed account or as specified by law, even if in such case it develops that the contractor has violated his trust while using the funds of A to pay for materials used on the property of B. . . . But it seems equally clear that where the materialman does have knowledge of the source and ownership of the funds delivered to him by the contractor, he may not apply them on the account of any other than the true owner, even though the contractor may have consented to their application elsewhere. . . ." (p. 425.)

We have examined the other cases from other jurisdictions cited in Homer's brief and are of the opinion that regardless of the general rule followed in a particular jurisdiction, the facts in the case

at bar go beyond mere knowledge or notice by the creditor of the source of the funds with which payment is made.

In this case the plaintiff by and through her authorized agent had full knowledge of the contents of the contract between Givens and Homer, dated December 11, 1953, and knew that all payments made thereunder were to be applied to the basic contract of July 17, 1952. Although she did not sign the contract, she was fully informed at the time by Homer's lawyer that payments would be made to her and Givens jointly "for Homer's protection." She then proceeded to accept joint payments from Homer on this contract as well as the contract dated March 2, 1956, between Givens and Homer. She obviously had notice of the source of the funds and the manner in which Givens and Homer agreed the payments were to be applied. We also note that Homer, by check made payable to the plaintiff's husband, paid delinquent taxes for 1953 to 1956 on the land in question. The plaintiff's course of conduct over the years in accepting the payments and applying all but two of them according to the manner intended by Homer hardly permits her in equity and good conscience to say now that she and Givens had the right to apply the two payments in question to other indebtedness due her from Givens.

After a careful study of our previous holdings in the cases cited by the parties, we note that in none of them do we find a similar fact situation; neither do we find fault with the decisions heretofore reached in the *Presbyterian* and *Crane* cases under the individual facts of each case. The facts here, however, are clearly distinguishable. The payments by Homer were to the plaintiff and Givens jointly—not to Givens alone to do with as he pleased. The plaintiff was informed of the manner in which the payments were to be applied, by virtue of the contract of December 11, 1953. The payments made by Homer did not become the unconditional property of Givens; he could not cash the checks delivered to him by Homer on his endorsement alone, nor could he deposit the checks in his bank account and commingle the proceeds with his own funds. These are all factors noted as not being present in the *Presbyterian* and *Crane* cases. The facts here give rise to a situation not covered by the holdings of either of the aforementioned cases. We therefore conclude that under all of the circumstances the trial court correctly determined that the two payments made by Homer should have been fully credited by the plaintiff to the basic contract of July 17, 1952.

Having decided that plaintiff misapplied the payments in question, we now turn to the memorandum agreement of October 17, 1958, between the plaintiff and Givens, which both parties concede was in the nature of an account stated. Homer had no knowledge of this instrument and he was not a party to it.

Plaintiff contends that the balance due of $25,000, as stated in the memorandum, was as binding upon Homer as it was upon Givens. As a basis for her contention plaintiff argues that when Homer took from Givens the assignment of the basic contract between plaintiff and Givens after commencement of this action, he took it subject to the provisions of the account stated, and that under the law of assignments Homer, as assignee of Givens' interest in the basic contract, acquired no greater rights than those possessed by Givens as the assignor.

It also appears from the record that over the plaintiff's objection the trial court permitted Homer to introduce evidence of his contracts with Givens that were entered into prior to the date of the account stated in an effort to show that the latter instrument was void by reason of a mutual mistake of fact. The plaintiff complains that in admitting this evidence the trial court erred. Plaintiff's argument on this point completely overlooks the fact that an account stated is only prima facie evidence of its correctness and it may be reopened and corrected for mistake or fraud. (*McCue v. Hope,* 97 Kan. 85, 154 Pac. 216; *Swaller v. Milling Co.,* 116 Kan. 329, 226 Pac. 1001.)

In the instant case the balance due on the basic contract, as acknowledged in the account stated, was arrived at without credit being given for payments made by Homer which were improperly applied by the plaintiff. Homer had no knowledge of the account stated nor its contents. The balance due, as recited therein, was incorrect. Under such circumstances Homer was not bound by the incorrect amount. The trial court, therefore, properly admitted into evidence the two contracts between Homer and Givens in order that the correct amount due on the basic contract could be determined.

All points raised by the plaintiff having been carefully examined, we are of the opinion the trial court did not err. The judgment is therefore affirmed.