(773 P.2d 666)

No. 62,649

HOME LIFE INSURANCE COMPANY, *Plaintiff-Appellant/Cross-Appellee*, v. DEAN C. CLAY, *Defendant-Appellee*, and FIRST NATIONAL BANK OF HOWARD, KANSAS, *Defendant-Appellee/Cross-Appellant*, v. RELIANCE INSURANCE COMPANY, *Third-Party Defendant*, and THE KANSAS BANKERS SURETY CO., *Third-Party Defendant/Appellant*.

Petition for review denied June 22, 1989.

Opinion filed April 28, 1989.

*Kenneth M. Clark,* of Gott, Young & Bogle, P.A., of Wichita, for appellant Home Life Insurance Company.

*Michael E. McMahon* and *J. Michael Morris,* of Klenda, Mitchell, Austerman & Zuercher, of Wichita, for appellee First National Bank of Howard.

*Thomas L. Theis* and *Jeffrey W. Jones,* of Sloan, Listrom, Eisenbarth, Sloan & Glassman, of Topeka, for appellant Kansas Bankers Surety Co.

Before REES, P.J., DAVIS and LARSON, JJ.

LARSON, J.: Home Life Insurance Company (Home Life) appeals from a judgment for conversion against Dean C. Clay and First National Bank of Howard (Bank). Bank appeals the amount of the court's allowance in mitigation of damages. Kansas Bankers Surety Co. (KBS) appeals from the court's ruling affording insurance coverage to Bank.

The insurance coverage issue has previously been before this court in *Home Life Ins. Co. v. Clay,* 11 Kan. App. 2d 280, 719 P.2d 756, *rev. denied* 239 Kan. 627 (1986).

Between May of 1975 and May of 1980, Clay was under written employment contracts with Home Life as a field underwriter. During his tenure with Home Life, Clay sold between $11 and $12 million in face amounts of life insurance coverage and made the million dollar round table all five years, as well as certain of Home Life's other top sales awards.

During the period from October 1979 through May 1980, Clay converted checks totalling $11,774.75 from Home Life to its customers by obtaining the customers' endorsements followed by his own and depositing them to his personal account. He separately converted checks totalling $102,550.39 by forging Home Life's endorsement followed by his own and depositing the checks into his personal checking account at Bank.

Bank accepted each of the converted checks for deposit to Clay's personal account without any inquiry or investigation. Bank had no written authorization showing Clay had authority to

endorse checks on behalf of Home Life. Prior to October 1979, Bank was aware that Clay's personal checking account was frequently overdrawn.

In May of 1980, James Woodall, the manager of Home Life's Wichita, Kansas, branch office, became concerned about Clay's enhanced lifestyle. Woodall discovered deposit slips showing large deposits being made to Clay's account. When Woodall expressed concern to Home Life's sales department, Home Life sent one of its in-house attorneys, Tom Coughlin, to Wichita to investigate the matter and confront Clay.

On or about May 28, 1980, at a meeting involving Clay, Coughlin, and Woodall, Clay admitted he had converted numerous checks. The following day, Clay met with Coughlin and discussed in detail the usage of the converted funds. Coughlin prepared an itemization of Clay's expenditures. According to Clay, Coughlin determined that $51,150 could realistically be recovered from Clay's purchases and expenditures; Coughlin estimated that Clay's vested commissions were worth $20,000; and Coughlin offered that, if Clay could come up with $46,157 in cash, the matter could be settled. According to Coughlin, Clay agreed to liquidate assets and deliver the proceeds to Home Life.

Clay contacted his brother, Orson Clay, president of a Texas insurance company, who agreed to co-sign a note for $46,000 to be used to settle with Home Life. On or about May 29, 1980, Clay informed Coughlin and Woodall that he had secured the money. Coughlin verified Clay's ability to secure these funds the following week by a telephone conversation with Clay's brother.

One of the items that Clay purchased with the converted funds was a single engine Cessna 206, purchased for $23,000 which, with the addition of substantial equipment, had a value of $30,000. On several occasions prior to commencement of this litigation, Clay offered to deliver to Home Life various items of personal property, including the airplane. These offers were declined by Home Life.

In connection with these restitution efforts, Clay delivered to Home Life a check from Eagle Manufacturing in the sum of $11,054.12, which Home Life refused to negotiate or apply against Clay's indebtedness for fear it might effect a release. The check subsequently became worthless.

According to Anthony Larosa, manager of contract services for

Home Life, all compensation due to Clay prior to January 1, 1980, had been paid. As soon as the conversion was discovered, Home Life began withholding payment of commissions earned by Clay and accumulated them in his compensation account. According to Home Life's records, the balance of Clay's compensation account was $24,441.79, which included first-year commissions, renewal commissions, a persistency bonus, and service fees earned subsequent to January 1, 1980.

Fred Liebau, Jr., assistant manager of Home Life's Wichita office, acting on Coughlin's instructions, contacted Bert Blackard, the president of Bank, to arrange a meeting to discuss Clay's bank account. Clay contacted Blackard and gave him permission to discuss his affairs with Home Life. A meeting was set up, although Liebau did not tell Blackard he intended to be accompanied by Home Life's attorney.

On June 5, 1980, Coughlin and Liebau met twice with Blackard at Bank's office. When Liebau introduced Coughlin to Blackard, Blackard became upset because of the unannounced presence of an attorney. When Coughlin stated that Bank could be liable to Home Life for acceptance of the forged checks, Blackard requested that Home Life's representatives leave.

After a few minutes, Coughlin and Liebau returned and were readmitted to Bank. Liebau stated the purpose of the meeting was investigatory. Coughlin told Blackard that Home Life would not sue Bank because there was not enough money involved and Liebau stated that Home Life wanted to avoid adverse publicity.

At no time during the meeting did either Coughlin or Liebau tell Blackard that Home Life intended to assert a claim against Bank. Nor did Coughlin retract his earlier statement that Bank could be held liable. The matter was referred to by Coughlin as "our problem" or the "Clay problem." No copies of converted checks were examined at the meetings.

Shortly after the June 5, 1980, meeting, Blackard reviewed certain checks in question. On checks payable to Home Life, Clay had first handwritten Home Life's name and then signed his own name under the endorsement. On Home Life's checks, Clay had obtained a proper endorsement of the payee and then signed his own name before depositing the check to his personal account.

Blackard called David Brace, Bank's attorney, to seek his

opinion on Bank's potential liability. Brace researched the question and drafted a letter to Blackard which was never mailed. In that letter, Brace used the word "claim," which was his language, not Blackard's. Brace informed Blackard orally that there were cases going both ways on Bank's liability. Brace never advised Blackard to put Bank's bond carrier on notice regarding the facts of the incident.

Blackard testified that he would not give notice to the bond carrier until he had actual notice that a lawsuit had been filed against Bank. On or about January 14, 1982, Blackard received a telephone call from Home Life's lawyer, who advised Blackard that Home Life was going to file suit. Shortly thereafter, Blackard gave Reliance Insurance Company (Reliance) notice of the expected suit. Reliance provided Bank with a forgery indemnity coverage during the period between November 9, 1978 to November 9, 1981. In Bank's notice to Reliance, Blackard stated he had been told no claim would be made against Bank.

After Reliance declined to undertake the defense, Blackard notified KBS, which also denied coverage. KBS provided the forgery indemnity coverage for Bank for a period subsequent to November 9, 1981, which was in effect in January of 1982 when the suit was filed.

Home Life filed its action on January 15, 1982, against Clay and Bank to recover damages for conversion of the checks. Bank impleaded Reliance and KBS, claiming a right of indemnity from one or the other.

In March 1985, the district court sustained motions for summary judgment of Reliance and KBS, finding that Bank did not meet the terms of the contract with Reliance as to notification of loss upon discovery and that the KBS bond was not in effect at the time of Bank's discovery of the loss. This decision was reversed by our court in *Home Life Ins. Co. v. Clay*, 11 Kan. App. 2d 280.

The case was tried in March of 1987 and, after additional time for discovery by Clay's last-minute counsel was allowed, suggested findings of fact and conclusions of law were submitted, and the court entered its memorandum decision on March 23, 1988. The trial court found Home Life had a valid claim against Clay in the amount of $114,325.14 and against Bank in the amount of $102,550.39, and ordered that from these amounts

both parties are entitled to an offset of $85,353.63. The offset was comprised of $11,054.12 for the check from Eagle Manufacturing that Home Life failed to negotiate, $69,299.51 for commissions owed by Home Life but not paid to Clay, and $5,000 for bonuses due to Clay from Home Life but not paid. Prejudgment interest was granted against the amount of the judgment.

The court found that KBS was obligated to indemnify Bank against its loss and that Reliance had no liability to Bank on this claim.

Home Life appeals, alleging the trial court did not correctly allocate the judgment between Bank and Clay, from allowance of the $11,054.12 offset, from allowance of the $5,000 persistency bonus, and from the finding of the compensation due from Home Life to Clay.

Bank cross-appeals, alleging the trial court erred in not further reducing the amount of Home Life's judgment against Clay and Bank by the value of Clay's other assets which were tendered to Home Life.

KBS appeals from the ruling holding it liable to indemnify Bank under the terms of its bond.

*Did the trial court correctly allocate the judgment between Clay and Bank?*

The trial court granted Home Life a net judgment after offsets against Clay of $28,971.51 and a net judgment after offsets against Bank of $17,196.37.

Home Life, without conceding the court correctly determined the amount of the offsets, contends *Aetna Casualty and Surety Co. v. Hepler State Bank,* 6 Kan. App. 2d 543, 630 P.2d 721 (1981), compels the conclusion that Home Life is entitled to recoup from Clay the difference between the amounts due from Clay and Bank to Home Life or $11,774.75. This amount is then applied to reduce the offset of $85,353.63, thereby reducing Clay's indebtedness and leaving a net offset of $73,578.88. Home Life then contends this offset reduces Bank's indebtedness of $102,550.39, resulting in a net judgment of $28,971.51 due and owing from Bank to Home Life. We do not agree and hold the trial court properly applied the offsets.

In *Aetna* a salesperson of Columbian Hog and Cattle Powder Company (Columbian) embezzled company funds through a forged endorsement scheme. 6 Kan. App. 2d at 545. Aetna,

Columbian's bond holder, recovered $1,100 from the salesperson (Orton) and our court said it was "hard pressed to see how the reduction of Orton's debt to Aetna and Columbian should reduce the liability of the bank to the same creditors." 6 Kan. App. 2d at 554. The result in *Aetna* followed the familiar rule that, if a debtor owes a creditor more than one debt, in the absence of direction from the debtor to the creditor as to how the payment of the debt is to be applied, the creditor may elect to apply any payment on the debt as he chooses. 6 Kan. App. 2d at 554-55. Because Orton did not direct the application of the funds, our court said that Aetna had the right to do so.

This case is factually different from *Aetna*. Home Life did not, until the filing of its brief on appeal, request the offset be first applied to Clay's indebtedness and then to Bank's. Bank, however, in its suggested findings of facts asked that the $11,054.12 from the Eagle Manufacturing check "is to be deducted from the monies, if any, that the Court determines are owed Home Life by either Clay and/or the Bank" and in its requested conclusions of law that "any monies owed by either Clay or Bank must be offset due to Home Life's failure to mitigate its damages."

The rule in Kansas on application of funds was well stated in *Lumber Co. v. Workman*, 105 Kan. 505, 509, 185 Pac. 288 (1919):

"It is the law that a debtor who owes two or more accounts to a creditor may direct to which account any money which he voluntarily pays shall be applied. It is also the law that when the debtor pays without directing to which of his accounts his payment shall be applied, the creditor has the privilege of applying the sum paid to either of the accounts. [Citation omitted.] And where neither debtor nor creditor exercises this privilege, the court will apply it as justice may suggest (21 R.C.L., 97-100), and this often requires that the payment be applied to the discharge of the earliest items of the account."

See *Carry, Executrix v. Homer*, 195 Kan. 475, 479, 407 P.2d 538 (1965); *In re Hart's Transfer & Storage, Inc.*, 6 Kan. App. 2d 579, 581, 631 P.2d 258 (1981).

Home Life made no request for an offset of the tendered funds first against Clay's indebtedness. Bank requested the tendered funds be applied to both its indebtedness and Clay's. We hold the trial court was allowed to make the application of the offsets as it believed justice might suggest. Clay's indebtedness to Home Life was larger than Bank's indebtedness to Home Life. The court was justified in applying the offsets in a manner consistent with this fact. Bank had no legal liability or responsi-

bility for those checks upon which valid endorsements were obtained. They were properly endorsed by Clay and required the collection of such amounts directly from Clay. The whole process is in reality a computation of exposure or liability of Bank and Clay which was appropriately made. The trial court correctly allocated the judgment and the offsets between Bank and Clay.

*Did the trial court find the proper amount of compensation due and owing from Home Life to Clay?*

Home Life contends the trial court's findings of fact and conclusions of law that Clay was entitled to receive $69,299.51 in commissions and a persistency bonus of $5,000 are not supported by competent evidence.

"Where the trial court has made findings of fact and conclusions of law, the function of this court on appeal is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. [Citations omitted.] Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. [Citation omitted.] Stated in another way, 'substantial evidence' is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. [Citation omitted.]" *Williams Telecommunications Co. v. Gragg*, 242 Kan. 675, 676, 750 P.2d 398 (1988).

Shortly before trial, with the time being limited by Home Life's inability to properly provide records of sales and commissions, Clay prepared a short memorandum showing that $69,299.51 was the minimum amount of money owing to him by Home Life. Clay concluded he was owed $24,336.22 on renewal commissions. Clay took into account termination dates of some of the insurance policies from a document prepared by Home Life, which did not include certain pension plans, group policies, ESP, or flexible annuity business that Clay had written during his tenure with Home Life.

Clay testified that $11,821 in income was reported by Home Life on his 1980 W-2 form that was not paid to him and that an additional $2,712.64 was withheld in 1982. Clay determined that commissions in the amount of $10,359.59 for certain group policies had not been paid. Finally, Clay determined that the remainder of the $69,299.21 was made up of a *persistency bonus* and commissions on policies that were written but not issued prior to his termination.

During the course of the discovery, Clay requested that certain

commission records be produced. Home Life could not locate any of Clay's commission records prior to January 1, 1980. At the end of the trial, the court directed Home Life to perform another search of its records and to produce the missing commission records. The second search also failed to produce Clay's commission records. The trial court properly ruled that failure to produce records and documents within Home Life's control concerning the status and disposition of the policies Clay had sold for it raises a presumption that the evidence which would be disclosed by those records was unfavorable to Home Life. *Armstrong v. City of Salina*, 211 Kan. 333, 339, 507 P.2d 323 (1973).

Larosa, the manager of Home Life, offered three different opinions as to the amount of compensation for commissions still owed Clay. The first was $10,359, the second, $24,441.75, and the last $36,598.66, with an admission that it might still be understated by $5,000. The trial court's ruling that Clay's commission agreements with Home Life regarding the vesting of commissions are ambiguous is not challenged by Home Life. Home Life's evidence was confusing, appeared not to give Clay credit for work in progress at the time the conversion was discovered, and was deemed incredulous by an employee of another insurance company.

The trial judge, subject to our holding hereinafter stated as it relates to the double allowance of the $5,000 persistency bonus, had substantial competent evidence to justify the allowance of $69,299.51 of compensation due and owing from Home Life to Clay.

*Was the $5,000 persistency bonus included in the $69,299.51 due and owing from Home Life to Clay?*

Although the trial court allowed a $5,000 offset for a persistency bonus in addition to the $69,299.51, it is clear from Clay's testimony that the bonus was included in this amount. In response to questions concerning compensation, Clay testified as follows:

"Q All right. Were there some other compensations, according to your calculations, that you were entitled to based on numbers they provided you?
"A Yes.
"Q What were those numbers?
"A I show that the *persistency bonus*, the policies written but not paid for, W-2 income I hadn't received, and then Home Life had provided us that on group commissions, they were carrying then $10,359.59. All total, it was $69,299.51." (Emphasis added.)

Although Clay testified that he had been told by Liebau that his persistency bonus might be as high as $15,000, his own testimony includes the persistency bonus within the $69,299.51 calculations and does not justify the additional $5,000 amount.

Larosa testified that Home Life's May 1980 statement, which is reflected on plaintiff's exhibit number 27, included a persistency bonus of $4,155.45.

The testimony that Clay had received credit for the persistency bonus is uncontradicted. "Uncontradicted evidence which is not improbable or unreasonable cannot be disregarded . . . unless it is shown to be untrustworthy; and such uncontradicted evidence should ordinarily be regarded as conclusive." *Demars v. Rickel Manufacturing Corporation*, 223 Kan. 374, 380, 573 P.2d 1036 (1978); *Crabtree v. Beech Aircraft Corp.*, 5 Kan. App. 2d 440, 442, 618 P.2d 849 (1980).

The trial court's findings that Clay was entitled to the $5,000 persistency bonus in addition to the amount of compensation which Clay testified to be due and owing is not supported by the evidence. That portion of the judgment allowing an additional offset for the $5,000 persistency bonus is reversed.

*Did the trial court properly apply the doctrine of mitigation of damages?*

The trial court found that Home Life was under a duty to exercise reasonable care and diligence to mitigate its damages due to Clay's conversion. The court held that Clay and Bank were entitled to an $11,054.12 offset for the value of the Eagle Manufacturing check payable to Home Life which was delivered to it unconditionally. Home Life has appealed the trial court's ruling on this point.

Bank appeals from the trial court's failure to offset the damages awarded Home Life by $46,000 which was offered to Home Life to settle the matter and by the value of a Cessna 206 airplane that was tendered to and rejected by Home Life.

As Bank correctly points out, the appellate courts of Kansas have not had an occasion to consider the issue of mitigation of damages in the context of a conversion action.

The duty of an injured party to mitigate its damages has long been recognized by the Kansas courts. In *Creten v. Chicago, Rock Island & Pac. Rld. Co.*, 184 Kan. 387, 402, 337 P.2d 1003 (1959), the court stated:

"It is a general rule of law that one who is injured by the wrongful or negligent acts of another is bound to exercise reasonable care and diligence under the circumstances to avoid loss or to minimize the resulting damages and to the extent that his damages are the result of the failure to exercise such care and diligence, he cannot recover."

A party must make reasonable efforts to mitigate damages, and recovery will not be allowed for damages that a party should have foreseen and could have avoided by reasonable effort without undue risks, expense, or humiliation. *First Nat'l Bank v. Milford,* 239 Kan. 151, 158, 718 P.2d 1291 (1986). A corollary to the general rule is that damages are not regarded as avoidable when one party has acted to prevent the other party from taking reasonable steps to avoid them. *Theis v. duPont, Glore Forgan Inc.,* 212 Kan. 301, Syl. ¶ 10, 510 P.2d 1212 (1973).

In *Theis,* a plaintiff sought damages for alleged unauthorized trading of a commodity account. Defendant argued that plaintiff failed to mitigate his damages by not acting sooner to stop the alleged unauthorized trading. The Kansas Supreme Court set forth what is meant by having a *duty* to mitigate damages:

"Our cases have frequently stated that one who is damaged by breach of contract is under a *duty* to minimize or mitigate his damages where he can do so by the exercise of reasonable diligence. [Citations omitted.] The use of the term 'duty' is criticized by the text writers. See 5 Corbin on Contracts, § 1039; 11 Williston on Contracts, § 1353. The rule, more properly stated, is simply that damages are not recoverable for harm that the plaintiff should have foreseen and could have avoided by reasonable effort without undue risk, expense or humiliation. Restatement, Contracts, § 336. Comment *d* to the Restatement section explains why the term 'duty' should not be employed:

" 'It is not infrequently said that it is the "duty" of the injured party to mitigate damages so far as that can be done by reasonable effort on his part. Since his legal position is in no way affected by his failure to make this effort, however, it is not desirable to say that he is under a "duty." His remedy will be exactly the same, whether he makes the effort and avoids harm or not. But if he fails to make the reasonable effort with the result that his harm is greater than it would otherwise have been, he cannot get judgment for the amount of this avoidable and unnecessary increase. The law does not penalize his inaction; it merely does nothing to compensate him for the harm that a reasonable man in his place would have avoided.' " 212 Kan. at 307.

The doctrine of mitigation is not without limitation. Not only is the injured party not required to endure expenses or humiliating or unduly burdensome activities, a party is not required to enter into a new contract with one who has breached the original

agreement even though terms are offered which would result in avoiding the loss. *Iseman v. Kansas Gas & Electric Co.*, 222 Kan. 644, 647, 567 P.2d 856 (1977). The court in *Iseman* quoted from 25 C.J.S., Damages § 96 as follows:

" 'Uncertain and contingent possibilities cannot be taken into consideration in mitigation of damages. An offer to plaintiff of something other than that which he is entitled to as compensation is not admissible in mitigation; nor can defendant who is bound to make compensation in money compel plaintiff to accept it in another medium.' " 222 Kan. at 647.

Following the logic of *Iseman*, with the converted property being checks or money, it would logically follow that Home Life should be compelled to accept an unconditional tender of money in mitigation of its damages but not other property (such as an airplane).

Restatement (Second) of Torts § 922 (1977) appears to be applicable:

"Return or Tender of Return of Converted Chattel

"(1) The amount of damages for the conversion of a chattel is diminished by its recovery or acceptance by a person entitled to its possession.

"(2) The amount of damages may, in the discretion of the court, be diminished by a tender of return of the chattel to one entitled to its possession if

"(a) it was converted in good faith and under a reasonable mistake, and

"(b) its value to the one entitled to possession is not substantially impaired, and

"(c) the tender is made promptly after discovery of the mistake and is kept open."

All of the Restatement examples deal with return of like-kind property. The most instructive comment deals with discretion of the court and states:

"*h. Discretion of the court.* The privilege of mitigation of the damages by return of the chattel is equitable in its nature. When the privilege is granted, there is specific relief, such as is commonly afforded by equity. The privilege is not a matter of absolute right but lies within the discretion of the trial court in the light of all of the circumstances of the case. The court is not required to reduce the damages in any case in which it would be inequitable to do so or to refuse a reduction in any case in which it would be equitable to grant it."

Application of the foregoing principles to this problem clearly shows the trial court was justified in holding that Home Life was obligated to accept the $11,054.12 payment offered in mitigation for the money converted. Home Life's argument that by accepting such amount it might have been deemed an accord and satisfaction or caused Clay's release is without merit.

A totally different ruling is indicated with reference to the

offered airplane and $46,000 cash payment which was offered as a settlement of the entire controversy.

Home Life was not obligated to become owner of an airplane and accept the attendant liabilities. The wording of *Iseman* and the provisions of § 922 of the Restatement (Second) of Torts, both justify the trial court's refusal to penalize Home Life for failing to accept property of a nature other than that converted.

Had the $46,000 cash been offered unqualified, as the check of Eagle Manufacturing was, the trial court's refusal to reduce the damages by such amount might not be justifiable. Such, however, was not the case. The $46,000 was part of a settlement attempt and, similar to what exists under K.S.A. 60-452 with relation to offers and compromise as evidence of liability, its offer here was an attempt to satisfy all of Clay's obligations. While in retrospect Home Life might wish that such amount had been accepted, the trial court correctly held that it could not be utilized to reduce the damages awarded.

*Did the trial court properly construe the terms of the KBS bond?*

The trial court found that Bank discovered the loss on January 14, 1982, when Bert Blackard, the president of Bank, was advised by Glen Young, the attorney for Home Life, that suit was going to be filed rather than on June 5, 1980, when Coughlin and Liebau advised Bank of the activities of Clay. The bond in question was issued by KBS on November 9, 1981. The relationship between KBS and Bank is that of insurer and insured. The dispute is not whether the type of loss suffered by Bank is covered by the bond, but whether the loss was discovered during the period of time in which the KBS bond was in existence.

Our court in *Home Life Ins. Co. v. Clay*, 11 Kan. App. 2d 280, 283, 719 P.2d 756 (1986), stated: "If Home Life promised not to sue the Bank for its negligence in accepting the forged checks, the Bank would not sustain a loss and it would not have received notice of a potential claim of liability." The factual uncertainty about the discovery date prohibited summary judgment in favor of KBS and resulted in the reversal.

The trial court herein made the following findings of fact based on substantial competent evidence, which is fatal to KBS in this appeal:

"13. . . . At the second meeting in the bank with Bert Blackard, Tom Coughlin

the attorney for Home Life Insurance Company told [Bert] Blackard that Home Life would not sue the bank because there was not enough money involved, and that Home Life wanted to avoid adverse publicity.

"14. During the second meeting with Mr. Blackard, Tom Coughlin did not discuss liability, but referred to the embezzlements as 'our problem,' or as the 'Clay problem.'

"15. At no time during the meeting on [June] 5, 1980, did either Tom Coughlin or Fred Liebau tell Bert Blackard that Home Life Insurance Company intended to assert a claim against the First National Bank of Howard, Kansas.

"16. Shortly before the meeting at the bank in Howard, Kansas, on June 5, Tom Coughlin and James 'Woody' Woodall held a meeting with the employees of the Liebau-Woodall Agency to discuss with the Employees Dean Clay's termination with the company and the conversion by Dean Clay of funds belonging to Home Life Insurance Company. Tom Coughlin told the employees at the meeting 'if we wanted to make a God-awful mess and stink out of this thing, we could look to the bank.' James 'Woody' Woodall said, 'but we aren't going to do that though.' And 'we aren't going to make any waves. We don't want to make any waves.' And Tom Coughlin said, 'we can resolve this problem in house, and that's the way it's going to be resolved. We don't need to resolve this in public.' "

The foregoing factual determinations justified the trial court in reaching the following conclusion of law:

"That Bert Blackard upon being advised by Tom Coughlin that Home Life Insurance Company was not going to sue the First National Bank of Howard, Kansas, was entitled to rely upon this representation and that the conversations held by Tom Coughlin and Fred Liebau with Bert Blackard on June 5, 1980, did not constitute notice of a potential claim of liability."

The KBS bond contained an explicit definition of "discovery":

"This bond applies to loss discovered by the Insured during the bond period. Discovery occurs when the Insured becomes aware of facts which would cause a reasonable person to assume that a loss covered by the bond has been or will be incurred, even though the exact amount or details of loss may not then be known.

"Notice to the Insured of an actual or potential claim by a third party which alleges that the Insured is liable under circumstances which, if true, would create a loss under this bond constitutes such discovery."

A bond is a type of insurance contract, and insurance contracts are subject to the same general rules of construction and interpretation as are contracts in general. *Mah v. United States Fire Ins. Co.*, 218 Kan. 583, 586-87, 545 P.2d 366 (1976). One of the most basic and fundamental rules of contract construction is that a contract which is plain and unambiguous on its face must be enforced according to its own terms. *Quenzer v. Quenzer*, 225 Kan. 83, 85, 587 P.2d 880 (1978).

Insurance policies, as other contracts, must be construed as a whole. *American Media, Inc. v. Home Indemnity Co.*, 232 Kan.

737, Syl. ¶ 1, 658 P.2d 1015 (1983). " 'The meaning of a contract should always be ascertained by a consideration of all the pertinent provisions and never be determined by critical analysis of a single or isolated provision.' " *First Nat'l Bank of Olathe v. Clark*, 226 Kan. 619, 624, 602 P.2d 1299 (1979) (citing *Tate v. Stanolind Oil & Gas Co.*, 172 Kan. 351, 240 P.2d 465 [1952]).

The construction of the discovery provisions in the instant case presents a question of law, not one of fact. *State v. Reineking*, 10 Kan. App. 2d 630, 706 P.2d 483, *rev. denied* 238 Kan. 879 (1985). Thus, "[r]egardless of the construction of a written instrument made by the trial court, on appeal the instrument may be construed and its legal effect determined by the appellate court." *Cornwell v. Jespersen*, 238 Kan. 110, 116, 708 P.2d 515 (1985).

The discovery provision in question is found in section four of the bond which is entitled "Conditions and Limitations." The definition of discovery clearly acts as a limitation on coverage, as the bond only applies to losses "discovered by the Insured during the bond period." The rule in Kansas on limitations in insurance policies is:

"Exceptions, limitations and exclusions to insuring agreements require a narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad premises, assumes a duty to define any limitations on that coverage in clear and explicit terms." *Krug v. Millers' Mutual Insurance Ass'n*, 209 Kan. 111, Syl. ¶ 2, 495 P.2d 949 (1972).

KBS contends the language of the provision provides that "discovery" occurs when either of two events occur: the awareness of facts described in paragraph one or the notice in paragraph two. Bank contends KBS' contention places an "or" between the first and second paragraphs of the discovery provision which does not exist and, under the standards set forth in *Krug*, conditions set forth in both paragraphs must be met.

KBS submits that no reasonable person in Blackard's position on June 5, 1980, when Liebau and Coughlin from Home Life met with Blackard at his Bank, could deny that the information imported gave him notice of facts which could support a claim against Bank.

KBS concedes that "reasonableness" is a question of fact but argues there were no facts to support the court's findings. However, the record indicates Blackard was told no suit would be filed. Liebau viewed the purpose of the meeting as only investigatory. Coughlin stated Bank could be liable at the first meet-

ing, but at no time did either Coughlin or Liebau tell Blackard that Home Life intended to assert a claim against Bank. The matter was referred to by Coughlin as "our problem" or as the "Clay problem." The court's findings that discovery had not occurred on June 5, 1980, was clearly supported by competent evidence.

KBS then focuses on the second paragraph of the discovery provision, wherein the language "potential claim" appears. KBS first cites *Long v. Hines*, 40 Kan. 220, 222, 19 Pac. 796 (1888), for the definition of potential as something existing " 'in possibility, not in [fact], not positively; in efficacy, not in actuality.' " KBS then adds that the definition of "claim" in Black's Law Dictionary 313 (4th ed. rev. 1968) is "an assertion," "a demand," "a challenge," or "a pretense." Thus, according to KBS the phrase "potential claim" must be related as "possible demand" or "possible assertion." This argument clearly broadens this provision in favor of the insurer and to the detriment of the insured, which violates the directives of *Krug*.

The term "potential" has been defined in Black's Law Dictionary 1052 (5th ed. 1979) as "[n]aturally and probably expected to come into existence at some future time, though not now existing." When this definition is considered along with the contentions of KBS, the question of fact is whether, based on these objective facts and evidence, a reasonable person would assume that a potential claim had been asserted against Bank. The trial court correctly concluded that Blackard did not assume that a "potential claim" was being asserted against Bank and the trial court properly so held.

In *Jefferson Bank & Trust Co. v. Central Sur. & Ins. Corp.*, 408 S.W.2d 825 (Mo. 1966), a case with similar facts involving the "discovery of a loss," the court stated: "[T]he time of discovery of the risk insured against is when the bank must reasonably have known and recognized that Brede had suffered a loss and that Brede apparently intended to attempt to hold the bank liable for such a loss." 408 S.W.2d at 832.

In *United States Fidelity & Guar. Co. v. Empire State Bank*, 448 F.2d 360 (8th Cir. 1971), the court was faced with the question of when discovery occurred. The court stated: "In determining when discovery has taken place, the trier of fact must find the pertinent underlying facts known to the insured

and must further determine subjective conclusions reasonably drawn therefrom by the insured." 448 F.2d at 365.

When the above standards are applied to the instant case, it is clear the trial court correctly determined that Bank discovered the loss in January of 1982, and KBS is obligated to indemnify Bank under the terms of the bond.

The trial court's allowance of the additional $5,000 offset is reversed. All of the remaining rulings of the trial court are affirmed. The case is remanded for entry of judgment in accordance with this opinion.