**WESTCHESTER FIRE INSURANCE COMPANY, Plaintiff,**

v.

**CITY OF PITTSBURG, KANSAS, a Municipal Corporation, Ernest Radell, Carol Radell, and Brandon Radell, a minor, by and through his mother and next friend, Carol Radell, Defendants.**

Civ. A. No. 90–2305–O.

United States District Court,
D. Kansas.

June 25, 1991.

Jerome V. Bales, D'Ambra M. Howard, Wallace, Saunders, Austin, Brown & Enochs, Overland Park, Kan., for Westchester Fire Ins. Co.

Frank D. Menghini, Douglas M. Greenwald, McAnany, Van Cleave & Phillips,

P.A., Kansas City, Kan., for City of Pittsburg, Kan.

Robert S. Tomassi, Loy & Loy, Pittsburg, Kan., for Ernest, Carol and Brandon Radell.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

This matter comes before the court on the motion of plaintiff Westchester Fire Insurance Company (hereinafter "Westchester") for summary judgment. Westchester contends that there is no coverage under a comprehensive general liability policy (hereinafter "CGL policy") that it issued to the defendant City of Pittsburg, Kansas (hereinafter "the City") for any claims asserted by Ernest Radell, Carol Radell, and Brandon Radell (hereinafter "the Radell family"), because the insurance policy contains a pollution exclusion clause. The defendant City asserts that the underlying tort litigation in the case at bar does not arise out of any acts of environmental pollution, but rather concerns alleged injuries suffered by City of Pittsburg residents as a result of normal city operations. For the reasons stated below, the court will deny plaintiff's motion.

## I. STATEMENT OF FACTS

In a tort action precipitating the case at bar, defendants Ernest and Brandon Radell allege that they suffered personal injuries on July 31, 1989, as a result of breathing and ingesting Zep Formula 2162, a malathion mixture sprayed from a vehicle operated by the City of Pittsburg.[1] Prentiss Drug and Chemical Company, a manufacturer of insecticides, describes malathion as follows:

> MALATHION is an insecticide of low mammalian toxicity, good knock-down effect and no residue, controlling a wide range of sucking and chewing insect pests in field, fruits and vegetables. It ensures *no environment pollution* and low hazard for wild life.

Prentiss Drug & Chem. Co., *Malathion Technical 95% Premium Grade* at 1 (emphasis added). A label on the container of Zep Formula states that "this product is toxic to fish" and instructs consumers not to contaminate water with Zep Formula.[2] The defendant City mixed diesel fuel with Zep Formula at a ratio of one part insecticide to thirty-nine parts diesel fuel.[3]

Westchester Fire Insurance Company issued a general liability insurance policy to the City of Pittsburg in November of 1988. This policy was in effect at the time in which the Radells allegedly sustained injuries. The commercial general liability coverage form contained in the policy states that Westchester Fire Insurance Company "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." *Westchester Commercial General Liability Coverage Form* ¶ 1(a). In addition, plaintiff's policy excludes coverage for "bodily injury" or "property damage" arising out of the discharge of pollutants. Westchester claims that the spraying of insecticide by the City "falls squarely" within the pollution exclusion clause, and

1. More specifically, Ernest Radell testified in a deposition that he was driving east on Twin Lakes Drive in Pittsburg, Kansas, as a city truck carrying a fogging device approached in the westbound lane. As the two vehicles neared each other, the truck turned right to the north. When the truck turned right, a thermal fogging device was suddenly activated and fog was sprayed into the Radells' vehicle.

2. Malathion was introduced in 1950 and quickly adopted by the agriculture industry for use on "most vegetables, fruits, and forage crops for control of an extensive range of insect pests." Ware, *Pesticides: Theory and Application* 42. Malathion is also suitable for home use because it is "safe to use around pets ... and control[s] practically every kind of garden and household insect including aphids and cockroaches." *Id.* Malathion is "so safe that it is prescribed by physicians for use on humans for the control of head, body, and crab lice." *Id.*

3. The Zep Formula itself contained fifty-seven percent malathion and the remaining forty-three percent was inert ingredients. The City mixed diesel fuel with Zep Formula in order to make the insecticide spray out as a mist or fog and to prevent its spraying device from overheating. Forty to fifty gallons of the mixture were typically prepared in one tank.

that it is therefore under no obligation to provide coverage for the Radells' alleged injuries.

## II. SUMMARY JUDGMENT STANDARDS

In considering a motion for summary judgment, the court must examine all the evidence in a light most favorable to the nonmoving party. *Barber v. General Elec. Co.*, 648 F.2d 1272, 1276 n. 1 (10th Cir. 1981); *Mahomes–Vinson v. United States*, 751 F.Supp. 913, 916 (D.Kan.1990). A moving party who bears the burden of proof at trial is entitled to summary judgment only when the evidence indicates that no genuine issue of material fact exists. Fed. R.Civ.P. 56(c); *Maughan v. S.W. Servicing, Inc.*, 758 F.2d 1381, 1387 (10th Cir. 1985); *see also* 6 J. Moore, *Moore's Federal Practice* ¶ 56.04 (1990) (court is authorized to examine materials outside complaint to determine whether there is genuine issue of material fact to be tried). If the moving party does not bear the burden of proof, he must show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). This burden is met when the moving party identifies those portions of the record which demonstrate the absence of material fact. *Id.* at 323, 106 S.Ct. at 2553; *Deines v. Vermeer Mfg. Co.*, 752 F.Supp. 989, 993 (D.Kan.1990).

Once the moving party meets these requirements, the burden shifts to the party resisting the motion, who "must set forth *specific facts* showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) (emphasis added). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleading." *Id.* Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511; *Tersiner v. Union Pac. R.R. Co.*, 740 F.Supp. 1519, 1522–23 (D.Kan.1990).

## III. CONSTRUCTION OF INSURANCE CONTRACTS

■ The legal principles which govern the construction of contracts of insurance provide that a court should consider the instrument as a whole rather than limit its analysis to a single, isolated provision. *Lightner v. Centennial Life Ins. Co.*, 242 Kan. 29, 35, 744 P.2d 840, 844 (1987); *Home Life Ins. Co. v. Clay*, 13 Kan.App.2d 435, 448–49, 773 P.2d 666, 676 (1989). Further, a court should endeavor to ascertain the intention of the parties from the language used, taking into account the situation of the parties, the nature of the subject matter, and the purpose to be accomplished. *Dronge v. Monarch Ins. Co. of Ohio*, 511 F.Supp. 1, 4 (D.Kan.1979); *Penalosa Co-op. Exchange v. Farmland Mut. Ins. Co.*, 14 Kan.App.2d 321, 323, 789 P.2d 1196, 1198 (1990). Policies must be construed according to the sense and meaning of the terms used, and if the language is clear and unambiguous, it must be taken in its plain, ordinary and popular sense. *Unified School Dist. No. 501, Shawnee County, Kansas v. Continental Casualty Co.*, 723 F.Supp. 564, 566 (D.Kan.1989); *Bramlett v. State Farm Mut. Ins. Co.*, 205 Kan. 128, 130, 468 P.2d 157, 159 (1970); *Glenn v. Fleming*, 14 Kan.App.2d 62, 69, 781 P.2d 1107, 1112 (1989), *aff'd in part and rev'd in part*, 247 Kan. 296, 799 P.2d 79 (1990). An unambiguous contract must be enforced according to its terms. *Simpson v. KFB Ins. Co., Inc.*, 209 Kan. 620, 624, 498 P.2d 71, 75 (1972); *Goforth v. Franklin Life Ins. Co.*, 202 Kan. 413, 417, 449 P.2d 477, 480–81 (1969).

■ An insurance contract, however, may be ambiguous. Ambiguity in a written contract does not appear until the application of pertinent rules of interpretation to the face of the instrument leaves one genuinely uncertain as to which of two or more meanings is proper. *Western Casualty & Surety Co. v. Budig*, 213 Kan. 517, 519, 516 P.2d 939, 941 (1973); *Clark v. Prudential Ins. Co.*, 204 Kan. 487, 491, 464 P.2d 253, 256 (1970); *Dodson Aviation, Inc. v. Rollins, Burdick Hunter of Kan-*

*sas, Inc.,* 15 Kan.App.2d 314, 319, 807 P.2d 1319, 1323 (1991). In order to be found ambiguous, an insurance contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language. *Dronge v. Monarch Ins. Co. of Ohio, supra,* 511 F.Supp. at 4; *Nash v. Adkins,* 11 Kan.App.2d 326, 329, 720 P.2d 1129, 1131 (1986). Where the terms of the policy of insurance are ambiguous, uncertain, conflicting or susceptible of more than one meaning, the construction most favorable to the insured must prevail. *Royal College Shop, Inc. v. N. Ins. Co. of N.Y.,* 895 F.2d 670, 674 (10th Cir.1990); *Chance v. Farm Bureau Mut. Ins. Co., Inc.,* 756 F.Supp. 1440, 1442 (D.Kan.1991); *Farm Bureau Mut. Ins. Co., Inc. v. Winters,* 248 Kan. 295, 300, 806 P.2d 993, 996 (1991). The terms of a policy are construed against the insurer in close cases because "the drafter must suffer the consequences of not making terms clear." *Lightner v. Centennial Life Ins. Co., supra,* 242 Kan. at 36, 744 P.2d at 845; *see also Gowing v. Great Plains Mut. Ins. Co.,* 207 Kan. 78, 79–80, 483 P.2d 1072, 1074–75 (1971) (construed against insurer because agreement is adhesion contract). When an insurance contract is not ambiguous, a court may not make another contract for the parties. *Patrons Mut. Ins. Ass'n v. Harmon,* 240 Kan. 707, 713, 732 P.2d 741, 746 (1987); *Braly v. Commercial Casualty Ins. Co.,* 170 Kan. 531, 538–39, 227 P.2d 571, 577 (1951).

The language of an insurance policy, like any other contract, must, if possible, be construed in such a manner as to give effect to the intention of the parties. *Transamerica Ins. Co. v. Gage Plumbing & Heating Co.,* 433 F.2d 1051, 1054 (10th Cir.1970); *Molzahn v. State Farm Mut. Auto. Ins. Co.,* 308 F.Supp. 1144, 1145 (D.Kan.1968), *aff'd,* 422 F.2d 1321 (10th Cir.1970); *Crawford v. Prudential Ins. Co.*

*of Am.,* 245 Kan. 724, 729, 783 P.2d 900, 904 (1989). In determining the intention of the parties, the subjective or undisclosed intent of the insurer does not control interpretation of the policy. *Carriers Ins. Co. v. Am. Home Assurance Co.,* 512 F.2d 360, 364 (10th Cir.1975); *St. Paul Fire & Marine Ins. Co. v. Medical Protective Co.,* 504 F.Supp. 877, 882 (D.Kan.1980), *aff'd,* 691 F.2d 468, 470 (10th Cir.1982). Rather, the test is what a reasonable person placed in the position of the insured would have understood the words to mean. *Wise v. Westchester Fire Ins. Co.,* 463 F.2d 386, 390 (10th Cir.1972); *Fancher v. Carson–Campbell, Inc.,* 216 Kan. 141, 145, 530 P.2d 1225, 1229 (1975); *N. Assurance Co. of Am. v. Farm Bureau Mut. Ins. Co., Inc.,* 15 Kan.App.2d 455, ——, 808 P.2d 911, 917 (1991).[4]

If the insurer intends to restrict or limit coverage provided in the policy, it must use clear and unambiguous language in doing so, employing such language as will clearly and distinctly reveal its stated purpose. *Kansas State Bank & Trust Co. v. Emery Air Freight Corp.,* 656 F.Supp. 200, 202 (D.Kan.1987); *Patrons Mut. Ins. Ass'n v. Harmon, supra,* 240 Kan. at 713, 732 P.2d at 746. This rule of construction applies with particular force to provisions which attempt to exclude liability coverage under certain conditions. *Gowing v. Great Plains Mut. Ins. Co., supra,* 207 Kan. at 81, 483 P.2d at 1075–76 (citing *Prickett v. Hawkeye–Security Ins. Co.,* 282 F.2d 294, 301 (10th Cir.1960)). It is a general rule that exceptions, limitations and exclusions to insuring agreements require a narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes a duty to define any limitations on that coverage in clear and explicit terms. *Traders State Bank v. Continental Ins. Co.,* 448 F.2d 280, 283 (10th Cir.1971); *Krug v. Miller's Mut. Ins. Ass'n,* 209 Kan. 111, 117, 495 P.2d 949, 954 (1972); *Home Life Ins. Co. v.*

---

**4.** *See also* Burke, *Pollution Exclusion Clauses: The Agony, The Ecstasy, and The Irony for Insurance Companies* 17 N.Ky.L.Rev. 443, __ (1990) (when ambiguities are found in insurance contracts, "courts have not hesitated to construe them in favor of the insured"—especially when taking reasonable expectation of insured into account).

*Clay, supra,* 13 Kan.App.2d at 449, 773 P.2d at 677.

■ As to the burden of proof, the well-established rule is that when an insurer seeks to avoid liability on the ground that the accident or injury for which compensation is demanded is covered by some specific exception to the general terms of the policy, *the burden of proof rests upon the insurer* to prove the facts which bring the case within such specific exception. *Dronge v. Monarch Ins. Co. of Ohio, supra,* 511 F.Supp. at 4–5 (emphasis added). The burden is on the insured to prove that the loss was of a type included in the general coverage provisions of the insurance contract. *Id.* at 5; *Golf Course Superintendents Ass'n of Am. v. Underwriters at Lloyd's, London,* 761 F.Supp. 1485, at 1489 (D.Kan.1991). Thus, the distinction between "coverage" provisions and exculpating or "exclusionary" clauses in an insurance contract is the decisive factor in determining which party has the burden of proof on an issue, where coverage under the policy is in dispute. *Id.; Baugher v. Hartford Fire Ins. Co.,* 214 Kan. 891, 900, 522 P.2d 401, 409–10 (1974); *Kru-*

*ler's Mut. Ins. Ass'n, supra,* 209 Kan. at 117–18, 495 P.2d at 954–55.

## IV. POLLUTION EXCLUSION CLAUSE

The commercial general liability policy issued by plaintiff to the City of Pittsburg states that Westchester Fire Insurance Company "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." *Westchester Commercial General Liability Coverage Form* ¶ 1(a).[5] The insurance policy also states that any bodily injury or property damage "must be caused by an 'occurrence.'" *Id.*[6] In addition, plaintiff's policy excludes coverage for "bodily injury" or "property damage" arising out of the discharge of pollutants. More specifically, the relevant exclusion states that the insurance provided by plaintiff does not apply to bodily injury or property damage "arising out of the actual, alleged or threatened discharge, dispersal, release or escape of *pollutants.*" *Id.* at ¶ 1(f)(1) (emphasis added).[7]

Pollution exclusion clauses are fairly common in insurance liability policies. Insurance companies added these provisions in an attempt to limit liability for environ-

5. Generally, the purpose of standard comprehensive liability policies is "to provide the insured with the broadest spectrum of protection against liability for unintentional and unexpected personal injury or property damage arising out of the conduct of the insured's business." Peters, *Insurance Coverage for Superfund Liability: A Plain Meaning Approach to the Pollution Exclusion Clause,* 27 Washburn L.J. 161, __ (1987).

6. The term "occurrence" is defined within the policy to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Westchester Commercial General Liability Coverage Form* § V, ¶ 9.

7. The standard pollution exclusion clause included in most commercial general liability policies disclaiming coverage for bodily injury or property damage "arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants" is not absolute. Virtually every pollution exclusion clause to come under judicial scrutiny in recent years contains an exception providing for coverage where the bodily injury or property damage results from a

discharge of pollutants that is "sudden and accidental." *See, e.g., Am. Motorists Ins. Co. v. Gen. Host Corp.,* 59 U.S.L.W. 2648, 1991 WL 35967, No. 88–1503 (10th Cir. Mar. 21, 1991); *Grant-Southern Iron & Metal Co. v. CNA Ins. Co.,* 905 F.2d 954, 956 (6th Cir.1990); *Int'l Surplus Lines Ins. Co. v. Anderson Dev. Co.,* 901 F.2d 1368, 1369 (6th Cir.1990); *Avondale Indus., Inc. v. Travelers Indem. Co.,* 887 F.2d 1200, 1202 (2d Cir.1989), *reh'g denied,* 894 F.2d 498 (2d Cir. 1990); *Claussen v. Aetna Casualty & Sur. Co.,* 865 F.2d 1217, 1219 (11th Cir.1989), *remanded,* 754 F.Supp. 1576 (S.D.Ga.1990); *United States Fidelity & Guar. Co. v. Morrison Grain Co., Inc.,* 734 F.Supp. 437, 445 (D.Kan.1990); *see also* Ribner, *Modern Environmental Insurance Law: "Sudden and Accidental",* 63 St. John's L.Rev. 755 (1989). In the context of motor vehicle liability insurance, Kansas has limited the application of pollution exclusion clauses to discharges of pollutants which are *not* "sudden and accidental." *See* K.S.A. 40–3107(i)(12). This provision discloses a legislative intent to distinguish between what is ordinarily considered pollution and incidents of an isolated and sudden nature which are better characterized as accidents in the operations or activities of the insured rather than environmental pollution.

mental damage.[8] Such exclusion provisions are "intended to exclude insurance coverage resulting from pollution and contamination of the environment, be it land, water, or the atmosphere." *Pepper Indus., Inc. v. Home Ins. Co.*, 67 Cal.App.3d 1012, 1019, 134 Cal.Rptr. 904, 908 (1977).[9] As noted above, exclusion provisions contained in insurance contracts must be construed narrowly by the court. *Traders State Bank v. Continental Ins. Co.*, supra, 448 F.2d at 283; *Home Life Ins. Co. v. Clay*, supra, 13 Kan.App.2d at 449, 773 P.2d at 677. Further, the burden of proof rests upon the insurer to prove the facts which bring the case within the exclusion. *Golf Course Superintendents Ass'n of Am. v. Underwriters at Lloyd's, London*, supra, 761 F.Supp. 1485, at 1489; *Dronge*

*v. Monarch Ins. Co. of Ohio*, supra, 511 F.Supp. at 4–5.

Defendant suggests that the threshold question in this case can be reduced to whether the fogging mixture allegedly inhaled or ingested by the Radells is a "pollutant." The term "pollutant" is defined in the insurance contract to mean "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste." *Id.* at ¶ 1(f)(2).[10] As previously noted, the fogging mixture sprayed by the defendant City included an insecticide, Zep Formula 2162. Zep Formula 2162 contains malathion. Westchester claims that malathion would constitute not only a "liquid or gaseous irritant or contaminant," but also would come within the specific terms of "vapor, fumes and chemicals."[11]

**8.** Insurance companies adopted standard pollution clauses in response to Congress' enactment of broad, sweeping legislation directed at cleaning up and protecting the limited resources of the United States. The Clean Air Amendments were passed in 1970. *See* Clean Air Act Amendments of 1970, Pub.L. No. 91–604, 84 Stat. 1676 (codified as amended in 42 U.S.C. §§ 7401–7642 (1983)) (purpose of Clean Air Act is protection and enhancement of quality of nation's air resources so as to promote public health and welfare). The passage of these new laws imposed greater potential economic burdens on insurance underwriters of comprehensive general liability policies. *See* Ericson, *Excluding the Pollution Exclusion: City of Johnstown, New York v. Bankers Standard Insurance Company*, 38 Wash.U.J.Urb & Contemp.L. 287, 288 (1990) (insurers became concerned about financial responsibility for remedial response cost judgments when Congress enacted the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601–57 (1982)); Smith, Rodberg & Chesler, *Patterns of Judicial Interpretation of Insurance Coverage for Hazardous Cite Liability*, Chemical Waste Litigation Rep. 324, 348 (1986) (insurance industry revised policies as to pollution coverage in response to greater potential liability).

**9.** Pollution clauses appear to contemplate long-term environmental degradation or, at the very least, an environment-wide exposure to extremely hazardous or toxic substances. The cases cited by Westchester involve the application of pollution exclusion clauses where there is long-term damage to the environment. *See Guilford Indus., Inc. v. Liberty Mut. Ins. Co.*, 688 F.Supp. 792, 793 (D.Me.1988) (rupture of insured's oil tanks caused massive release of fuel oil in river), aff'd, 879 F.2d 853 (1st Cir.1989); *Am. Motorists Ins. Co. v. Gen. Host Corp.*, 667

F.Supp. 1423, 1425 (D.Kan.1987) (salt pollution of aquifer over seventy-five-year period); *Management of Carolinas, Inc. v. Peerless Ins. Co.*, 315 N.C. 688, 689, 340 S.E.2d 374, 376 (disposal of waste materials over course of seven years rendered groundwater hazardous), reh'g denied, 316 N.C. 386, 346 S.E.2d 134 (1986); *League of Minn. Cities Ins. Trust v. City of Coon Rapids*, 446 N.W.2d 419, 420 (Minn. App.1989) (nitrogen dioxide, a toxic gas, built up in city ice arena over course of several months). In the above cases, the concept of "pollutant" was not read in isolation but rather the insurer established that the environment was indeed polluted by the insured. Here, by contrast, the Radells were allegedly exposed to a fogging mixture for a brief period of time. There is no allegation of environmental damage or long-term exposure to the insecticide.

**10.** The term "waste" is defined in paragraph 1(f)(2) to include "materials to be recycled, reconditioned or reclaimed." *Westchester Commercial General Liability Coverage Form* ¶ 1(f)(2).

**11.** The nature of the insecticide used in the City's fogger is a critical issue of fact. Defendant points out that malathion is regularly used and considered safe and suitable in numerous applications involving agricultural products for pets, livestock, and humans. Federal regulations promulgated by the Environmental Protection Agency approve the use of malathion as a pesticide under many circumstances, including the control of the Mediterranean fruit fly, direct application to raw agricultural commodities, and as a component in livestock feed. *See* 40 C.F.R. §§ 180.111, 180.1067, 185.3850, 185.7000, and 186.3850. Forrest E. St. Aubin, an urban pest management consultant with "some thirty

Plaintiff is asking the court to stretch the definition of "pollutant" beyond "what a reasonable person placed in the position of the insured would have understood the word to mean." Several examples offered by the City of Pittsburg illustrate the expansive nature of the definition urged by the insurance company:

> If a child at a city pool complains about the chlorine in his or her eyes, the causative factor is a chemical but the city has not polluted the environment. If a fire hydrant sprays water on a passer-by, that water may be an "irritant" to the person, but again the municipality responsible for the fire hydrant has not polluted the environment. If a city resident complains that the exhaust fumes from a city vehicle caused him or her breathing difficulty, the injury may be real but the city has not engaged in pollution.

Response brief of Defendant City of Pittsburg at 11, *Westchester Fire Ins. Co. v. City of Pittsburg*, No. 90–2305 (D.Kan. 1991). Under the interpretation suggested by plaintiff, almost any function undertaken by a municipal government could be characterized as "polluting" under the relevant exclusion clause. If this were the intent of Westchester, it certainly was not clearly expressed in the policy itself.

Plaintiff focuses a great deal of attention on the definition of "pollutants" contained in its insurance policy. As noted above, the definition includes "any solid, liquid, gaseous or thermal irritant or contaminant." Westchester proposes a broad reading of "irritant or contaminant" to include any substance or chemical that allegedly causes injury to any person. Of course, there is virtually no substance or chemical in existence that would not irritate or damage some person or property. The terms "irritant" and "contaminant," however, cannot be read in isolation, but must be construed as substances generally recognized as polluting the environment. In other words, a "pollutant" is not merely any substance that may cause harm to the "egg shell plaintiff," but rather it is a toxic or particularly harmful material which is recognized as such in industry or by governmental regulators.

An insurance company has a duty when it seeks to enforce an exclusion clause to "use clear and unambiguous language in doing so, employing such language as will clearly and distinctly reveal its stated purpose." *Kansas State Bank & Trust Co. v. Emery Air Freight Corp.*, supra, 656 F.Supp. at 202; *Patrons Mut. Ins. Ass'n v. Harmon*, supra, 240 Kan. at 713, 732 P.2d at 746.[12] Spraying or fog-

years of experience in pest control and pesticides," states that malathion's safety as a mosquito adulticide has been largely unquestioned and "has an enviable safety record and is not regarded as a dangerous compound or pesticide." St. Aubin added that malathion "is even recommended to the lay gardener because of its low toxicity." While the court is of course in no way determining the merits of the underlying case, we are of the opinion plaintiff has not established that malathion is recognized as an environmental hazard of such significance as to constitute a "pollutant."

**12.** The author of a recent comment published in a Washington University law review reports that a majority of courts find the standard pollution exclusion clause contained in commercial general liability policies to be ambiguous. *See* Ericson, *Excluding the Pollution Exclusion: City of Johnstown, New York v. Bankers Standard Insurance Company*, 38 Wash.U.J.Urb. & Contemp.L. 287, __ (1990); *see also* Greenlaw, *The CGL and the Pollution Exclusion Clause: Using the Draft History to Raise the Interpretation out*

*of the Quagmire* 23 Colum.J.L. & Soc.Probs. 233, __ (1990) (courts should interpret pollution exclusion clause with reference to ambiguity of insurance industry's statements); Ballard & Manus, *Clearing Muddy Waters: Anatomy of the Comprehensive General Liability Pollution Exclusion*, 75 Cornell L.Rev. 610, __ (1990) (intent of drafters of standard pollution exclusion clause is far from obvious; explanation of intended scope of exclusion provided by insurance companies is particularly murky as to intent to apply exclusion to unintentional releases or unintentional damages); Peters, *Insurance Coverage for Superfund Liability: A Plain Meaning Approach to the Pollution Exclusion Clause*, 27 Washburn L.J. 161, __ (1987) (numerous jurisdictions have held terms contained in standard CGL policy and pollution exclusion clause are ambiguous); Rosenkranz, *The Pollution Exclusion Clause Through the Looking Glass*, 74 Georgetown L.J. 1237, __ (1986) (most courts impose insurers with coverage when insured neither expected nor intended ultimate loss, even though loss may have arisen out of intentional act).

ging to prevent the swell of insects in the summer is an operation undertaken by many municipal governments. There are not any provisions in the insurance policy, however, that purport to expressly exclude this governmental function. Since spraying or fogging operations designed to control insects is an undertaking assumed by many municipalities, the insurer has the burden to explicitly exclude this activity from the broad commercial general liability coverage that it affords its clients. We conclude that Westchester has failed to define the limitations of its pollution exclusion clause in clear and explicit terms.

The court further finds that neither the language nor the purposes of the pollution exclusion clause supports plaintiff's broad reading of the exclusion to encompass injuries alleged to have occurred from an isolated exposure to malathion during normal municipal operations. Westchester Insurance is not seeking to avoid coverage for the effects or clean-up costs of "pollution" as that word is commonly understood—environmental degradation or contamination. Malathion is not itself recognized as a pollutant or hazardous substance and the activity of the City being challenged by the Radells is not a polluting activity such as waste water treatment, smokestack emissions, or dumping at a landfill. Accordingly, we will deny plaintiff's summary judgment motion.

IT IS THEREFORE ORDERED that the motion of plaintiff Westchester Fire Insurance Company for summary judgment (Doc. No. 22) is hereby denied by the court.