**PICERNE–MILITARY HOUSING, LLC, Bragg–Picerne Partners, LLC, And Picerne Construction/FBG, LLC, Plaintiffs,**

v.

**AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY, Defendant.**

**C.A. No. 08–273 S.**

United States District Court, D. Rhode Island.

Sept. 1, 2009.

Charles L. Philbrick, Esq., Rathje & Woodward, LLC, Wheaton, IL, Joseph V. Cavanagh, Jr., Esq., Mary C. Dunn, Esq., Blish & Cavanagh, LLP, Providence, RI, Trisha Rich, Esq., Holland & Knight LLP, Chicago, IL, Attorney for Plaintiff.

Jonathan L. Kranz, Esq., Neal M. Glazer, Esq., D'Amato & Lynch, LLP, New York, NY, Melissa A. Malone, Esq., Robert C. Shindell, Esq., Taylor, Duane, Barton & Gilman, LLP, Providence, RI, Attorneys for Defendant.

## MEMORANDUM AND ORDER

WILLIAM E. SMITH, District Judge.

This is an insurance dispute over the cost of removal of buried construction and demolition debris. In their motion for partial summary judgment, Picerne–Military Housing, LLC, Bragg–Picerne Partners, LLC, and Picerne Construction/FBG, LLC (collectively, Picerne) seek a declaratory judgment that American International Specialty Lines Insurance Company (AISLIC) must indemnify Picerne and pay ongoing investigation and remediation costs. For the following reasons, at this juncture the record does not present a purely legal insurance coverage question on undisputed facts. Partial summary judgment in favor of Picerne on Counts I (breach of contract) and II (declaratory judgment) will therefore be denied.

### I. Background and Policy

Picerne is involved in the development, construction and property management of the Fort Bragg Privatized Family Housing Project in North Carolina (the "Site"). From September 2004 through December 2007, it contracted with PBG of North Carolina, Inc. (PBG) to have demolition work, land clearing, utility infrastructure installation and land grading services completed at the Site. On June 12, 2007, the North Carolina Department of Environmental and Natural Resources (DENR) issued a Notice of Violation (Notice), which alleged Picerne operated a non-conforming solid waste disposal site/open dump at the Site in violation of state code. According

to the Notice, DENR's inspection revealed buried construction and demolition (C & D) debris consisting of painted wood, concrete, metal piping and white goods. Picerne and AISLIC agree that to date, what has been uncovered from beneath the Site includes large pieces of concrete, broken wood, rebar, metal, vegetation (tree trunks, tree limbs and mulch from chipped trees), and a limited amount of "white goods" (crushed refrigerator, compressors and a crushed underground storage tank).

The parties part ways on the factual question of "who done it." Picerne submits that without its "knowledge or permission, [subcontractor] PBG dug large pits at Fort Bragg and ... dumped waste materials from its demolition and land clearing activities into the pits, and then buried the waste material with dirt/soil." (Pl.'s Local Rule 56.1 Statement of Undisputed Facts 9, 21–27, 30–43 (Doc. No. 53).) AISLIC sings a different tune and has produced evidence suggesting the C & D debris may have been discarded with Picerne's knowledge and consent. (Def.'s Local Rule 56(a)(3) Statement of Disputed Facts 9 (Doc. No. 67).)

Picerne is insured under Pollution Legal Liability policy number 1157811 for the period August 1, 2003 through August 1, 2013 ("Policy"). Part B.1 provides AISLIC agrees to:

1. [p]ay on behalf of the **Insured, Clean–Up Costs** resulting from **Pollution Conditions** on or under the **Insured Property** that commenced on or after the **Continuity Date,** if such **Pollution Conditions** are discovered by the **Insured** during the **Policy Period,** provided:

 (a) The discovery of such **Pollution Conditions** is reported to the Company in writing as soon as possible after discovery by the **Insured** and in any event during the **Policy Period** in accordance with Section III of the Policy.

 Discovery of **Pollution Conditions** happens when a **Responsible Insured** becomes aware of Pollution Conditions.

 (b) Where required, such **Pollution Conditions** have been reported to the appropriate governmental agency in substantial compliance with applicable **Environmental Laws** in effect as of the date of discovery.

The Policy's DEFINITIONS section provides in relevant part:

D. **Clean–Up Costs** means reasonable and necessary expenses, including legal expenses incurred with the Company's written consent which consent shall not be unreasonably withheld or delayed, for the investigation, removal, remediation including associated monitoring, or disposal of soil, surfacewater, groundwater or other contamination:

 1. To the extent required by **Environmental Laws;**

F. **Environmental Laws** means any federal, state, provincial or local laws (including, but not limited to, statutes, rules, regulations, ordinances, guidance documents, and governmental, judicial or administrative orders and directives) that are applicable to **Pollution Conditions.**

U. **Pollution Conditions** means the discharge, dispersal, release or escape of any solid, liquid, gaseous or thermal irritant or contaminant, including, but not limited to, smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, medical waste and waste materials into or upon land,

or any structure on land, the atmosphere or any watercourse or body of water, including groundwater, provided such conditions are not naturally present in the environment in the amounts or concentrations discovered.

Y. **Responsible Insured** means the manager or supervisor of the **Named Insured** responsible for environmental affairs, control or compliance, or any manager of the **Insured Property,** or any officer, director or partner of the **Named Insured.**

Finally, the Policy contains the following exclusion:

D. **INTENTIONAL NONCOMPLIANCE:**

This Policy does not apply to Clean–Up Costs ... [a]rising from **Pollution Conditions** based upon or attributable to any **Responsible Insured's** intentional, willful or deliberate noncompliance with any statute, regulation, ordinance, administrative complaint, notice of violation, notice letter, executive order, or instruction of any governmental agency or body.

(Def. AISLIC's Resp., Ex. 1 (Doc. No. 66) (all emphasis in original).)

Picerne claims it has spent $11,527,920.11 thus far on investigation and clean-up following DENR's Notice.[1] AISLIC agreed to provide Picerne a defense but has denied indemnification for these and any future related costs. On July 22, 2008, Picerne filed suit under this Court's diversity jurisdiction. Both parties cite Rhode Island and North Carolina law but agree no substantial differences warrant a choice of law analysis.

II. Standard of Review and Rules of Interpretation

Summary judgment is proper if "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue of fact is genuine if it "may reasonably be resolved in favor of either party." *Vineberg v. Bissonnette,* 548 F.3d 50, 56 (1st Cir.2008) (internal citation omitted). A material fact "has the capacity to sway the outcome of the litigation under the applicable law." *Nat'l Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir.1995). The Court reviews the evidence in the light most favorable to AISLIC and draws all reasonable inferences in its favor. *See Cadle Co. v. Hayes,* 116 F.3d 957, 959 (1st Cir.1997). It bears emphasizing that the Court's role is to determine whether triable factual issues exist—not to resolve them one way or the other. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

 Picerne has the burden to prove the existence of coverage and, on summary judgment, demonstrate that AISLIC, as a matter of law, cannot prove an exclusion applies. *See Gen. Accident Ins. Co. of Am. v. Am. Nat'l Fireproofing, Inc.,* 716 A.2d 751, 757 (R.I.1998). The policy language must be examined in its entirety and given its "plain, ordinary and usual meaning." *Sentry Ins. Co. v. Grenga,* 556 A.2d 998, 999 (R.I.1989); *see Amica Mut. Ins. Co. v. Streicker,* 583 A.2d 550, 552 (R.I.1990) (court affords equal weight to all terms and may not create ambiguity by "viewing a word in isolation" or "taking a phrase out of context"). Ambiguity only exists when terms are susceptible to more

---

1. AISLIC says Picerne lacks proof such as work orders and invoices; Picerne retorts that it provided ample documentation. Given the instant disposition, this issue remains for another day.

than one reasonable interpretation. *Merrimack Mut. Fire Ins. Co. v. Dufault*, 958 A.2d 620, 625 (R.I.2008); *see Gregelevich v. Progressive Nw. Ins. Co.*, 882 A.2d 594, 595–96 (R.I.2005) (test is what an ordinary insured would understand words to mean).

## III. Discussion

■ Picerne's first argument is that the C & D debris is "waste material" under the definition of Pollution Conditions, and thus AISLIC must pay incurred Clean–Up Costs. AISLIC responds that first, Picerne has not met its burden to produce sufficient evidence that a Responsible Insured notified AISLIC in writing "as soon as possible" upon discovery of the debris (given the evidence Picerne knew about it all along). Moreover, as to Clean–Up Costs resulting from Pollution Conditions, AISLIC says Picerne puts the cart before the horse. That is, although the C & D debris is waste Picerne lacks proof that it is anything but environmentally benign. As a result, it cannot meet the threshold "irritant or contaminant" requirement of Pollution Conditions as those phrases are commonly understood, because the innocuous debris in the soil qualifies as neither.

### A. Reporting of Discovery

Taking the less intriguing point first, there is a triable issue as to when a Responsible Insured at Picerne first "discovered" the debris vis-vis notifying AISLIC in the spring of 2007. It is undisputed that timely notice is a condition to coverage under B–1(a) Picerne must prove, and AISLIC's proffered evidence raises a genuine issue of material fact in response to Picerne's claim that it had no knowledge of or involvement in the dumping before 2007. In particular, AISLIC points to affidavits of PBG officers and employees and other correspondence among PBG, Picerne and DENR that indicate specific Picerne management personnel on Site, for example, "witnessed or directed the debris burial on any number of occasions, in various locations." (Doc. No. 66–24); *see also* (Doc. No. 66, ex. 18) ("PBG has continued to cooperate ... doing as instructed by Picerne, whose employees were also involved in the inappropriate burying, according to our investigation.").

Picerne's lone reply is that this conclusory evidence is based on hearsay and a lack of personal knowledge and, in any event, only implicates "low-level" employees. Whether the referenced personnel (or others) qualify as Responsible Insureds and whether they knew of or directed C & D debris dumping (and when) are disputed factual questions, which must be resolved at trial. When AISLIC is given, as it must be, the benefit of the doubt, it is not clear that the coverage condition set forth in B–1(a) has been satisfied. For this reason alone, partial summary judgment is inappropriate.[2]

### B. Clean–Up Costs Resulting from Pollution Conditions

Setting aside the discovery question, the center stage controversy presents a twist on an "oft-litigated" issue. *St. Paul Fire & Marine Ins. Co. v. Warwick Dyeing Corp.*, 26 F.3d 1195, 1197 (1st Cir.1994). To frame the analysis, in the usual course the question of what constitutes a pollutant arises out of a general liability insurer's attempt to enforce a pollution exclusion.

---

**2.** Picerne's Motion to Strike (Doc. No. 72) for the most part challenges the weight of this evidence and is denied. Moreover, Picerne's waiver argument is unpersuasive for many of the reasons discussed during argument, including that AISLIC had no reason to suspect Picerne's involvement early on and reserved its right to supplement its position upon receipt of additional information.

In that context, the insurer urges a broad reading of the exclusion while the insured presses for a narrow interpretation to afford greater coverage. Here, things are backwards. AISLIC's pollution liability policy insures (in language mirroring the standard definition used by virtually all carriers in this context) that which most commercial general liability policies seek to exclude. As a consequence, it is AISLIC that proffers the narrow view in claiming the C & D debris is not a Pollution Condition, and Picerne the more expansive.[3]

First off, Picerne's contention that it need only establish the debris is "waste material" to trigger indemnification is easily dispatched. AISLIC is correct that Picerne attempts to transform an "including but not limited to" example into the absolute definition of Pollution Conditions. It is a misreading of the plain language to discard the "discharge, dispersal, release or escape of any solid, liquid, gaseous, or thermal irritant or contaminant" starting point simply because the Policy informs the common understanding of "irritant or contaminant" by way of a non-exhaustive list of examples of what *could* qualify as a Pollution Condition. In short, the fact that the debris can be classified as waste (indeed, AISLIC refers to it as such) does not per se entitle Picerne to indemnification. *See Aetna Cas. & Surety Co. v. Dow Chem. Co.*, 933 F.Supp. 675, 681–82 (E.D.Mich.1996) (agreeing that insurer's reference to claims as involving "contamination" was not an admission or dispositive of pollution issue).

The real battle is over the reasonable meaning of "irritant or contaminant" with respect to the C & D debris. Picerne urges a sort of "not supposed to be there" standard—a crushed refrigerator and metal or concrete scraps are undesirable and unwholesome additions beneath the ground at the Site and under the foundation of homes. Therefore, by their nature, the pieces of debris made the soil impure and "unfit for use; therefore, they are contaminant and that soil is contaminated with them." (Hr'g Tr. 13:18–20, July 28, 2009.) AISLIC contends this overly broad reading flies in the face of (1) the many cases that construe pollution as involving hazards traditionally recognized to harm the public or environment; and (2) the undisputed record facts showing the C & D debris was non-hazardous and posed no substantial risk of harm to human health or the soil or surrounding environment. *See, e.g.*, (Doc. No. 66, ex. 5) (Fort Bragg media release indicating "[t]he buried debris has been classified as non-hazardous

---

**3.** There is no shortage of guidance in the pollution exclusion realm, which is helpful considering neither party cited (and the Court has located few) pollution policy cases where, as here, the "irritant or contaminant" issue is the threshold point. And there is no definitive authority on the question in Rhode Island. Unfortunately, the only clear principle from the abundance of pollution exclusion cases is that the issue is always fact driven and hotly contested. *See* 9 Couch on Insurance § 127:8 (3d ed.2007) (noting "[t]he word 'pollutant' has received a great deal of scrutiny" and discussing different approaches); *see also, e.g., James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270 (11th Cir. 2008) (construction debris qualified as pollutant within exclusion where underlying suit sought damages from resulting elevated levels of methane gas); *Nautilus Ins. Co. v. Jabar*, 188 F.3d 27 (1st Cir.1999) (rejecting insurer's broad reading of exclusion where language could not reasonably be read to bar coverage for claims relating to isolated hazardous fumes discharged by roofing product that were not traditional environmental pollution); *Westchester Fire Ins. Co. v. City of Pittsburg*, 768 F.Supp. 1463 (D.Kan.1991) (denying insurer's motion for summary judgment based on exclusion following isolated exposure of insecticide where purported pollutant was not a hazardous substance and caused no environmental degradation).

waste ... the material does not pose an environmental threat ... it was illegal to bury debris in an unpermitted landfill").

As is often the case, the answer lies somewhere in the middle (although closer to AISLIC's end than Picerne's). While it is true that Rhode Island law favors a broad reading in favor of coverage, Picerne's perception of "contaminant" on these facts strains reasonable interpretation. The weakness of its position is that it would, in essence, capture any and all materials in or on the soil that ordinarily would not be found there and do not naturally occur. As many courts have observed, such a literal dictionary-like construction is "virtually boundless" and stretches the language far beyond its reasonable intended scope. *Nautilus Ins. Co. v. Jabar,* 188 F.3d 27, 30–31 (1st Cir.1999) (quoting *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.,* 976 F.2d 1037, 1043 (7th Cir.1992)).

What is more, Picerne's view would result in AISLIC's pollution legal liability insurance providing almost endless coverage when anything happens to or affects or is interspersed or mixed with the soil or groundwater or surfacewater at the Site (regardless of its effect, if any, and regardless of whether it caused harm). It is hard to imagine a reasonable insured, or insurer, would anticipate such a result under the language and context of AISLIC's policy. *See Reg'l Bank of Colorado v. St. Paul Fire & Marine Ins. Co.,* 35 F.3d 494, 498 (10th Cir.1994) (noting the term irritant should not be read in isolation as applying to every possible irritant or contaminant imaginable, but "must be construed in the context of how it is used in the policy, i.e., defining 'pollutant' "); *Westchester Fire Ins. Co. v. City of Pittsburg,* 768 F.Supp. 1463, 1470–71 (D.Kan.1991) (interpreting "irritant" or "contaminant" as "substances generally

recognized as polluting the environment. In other words, a 'pollutant' is not merely any substance that may cause harm to the 'egg shell plaintiff,' but rather it is a toxic or particularly harmful material which is recognized as such in industry or by governmental regulators."); *MacKinnon v. Truck Ins. Exch.,* 31 Cal.4th 635, 3 Cal. Rptr.3d 228, 73 P.3d 1205, 1216–17 (2003) (considering purpose of pollution exclusion clauses "adopted to address the enormous potential liability resulting from anti-pollution laws" and construing clause as applying to injuries arising from events commonly thought of as conventional environmental pollution).

Having said this, the Court stops short of embracing AISLIC's all-or-nothing suggestion that seemingly "innocuous" wastes like the C & D debris can never be irritants or contaminants (and thus not pollutants) absent proof the material was definitively classified as hazardous and/or actually caused harm. To be sure, it is relevant that Picerne's only alleged violation was of 15A N.C. Admin. Code 13B.0105(a) (2009) in that "waste was transported to a site that is not permitted to receive solid waste and was buried." It is likewise relevant that much of the soil from the excavated debris was returned untreated to the Site for use as backfill (after debris was disposed of at a landfill permitted to receive only non-hazardous waste). (Doc. 66, Ex. 4 at 2; Exs. 5–11.) But these facts alone, while not unimportant, are not dispositive of whether a reasonable insured would classify the C & D debris as within the sphere of coverage. *See West Bend Mut. Ins. Co. v. Iowa Iron Works, Inc.,* 503 N.W.2d 596, 600 (Iowa 1993) (pollution exclusion did not eliminate insurer's duty to defend where underlying state action was based on depositing solid waste in an unlicenced place, because "[s]uch violations are not necessarily

based on contaminant or irritant materials").

What all of this means, then, is that even under the Court's construction of "irritant or contaminant" there are too many open questions to grant Picerne the relief it seeks. Although both parties submit that whether the C & D debris qualifies as a Pollution Condition is not a factual issue warranting trial, on these particular facts the Court disagrees.[4] Without doubt, "[t]he determination of whether a substance is a pollutant is fact intensive." 9 Couch on Insurance § 127:8 (3d ed.2007) (discussing factors that often govern whether a substance is a pollutant). Picerne's motion prompts the question of to what extent sink holes have formed at the Site, and, if so, whether people have been harmed by them and whether allowing the C & D debris to remain buried would have posed a health hazard. Moreover, Picerne claims (albeit with unclear evidentiary support) that "methane gas from the decaying waste began to be released" at the Site, which poses a substantial hazard to health and the environment. (Pl.'s Reply Mem. 11 (Doc. No. 74).) Given that AISLIC did not cross-move for summary judgment, the Court gives Picerne the benefit of the doubt that it may have evidence sufficient to prove the C & D debris is an "irritant or contaminant" within this Court's construction of the Policy. *See In re Hub Recycling, Inc.*, 106 B.R. 372, 374–76 (D.N.J. 1989) (in context of pollution exclusion, accepting narrower meaning of pollutant while rejecting broader definition that would encompass all waste, but reserving for fact finder question of whether the dumped debris and recyclables constitute irritants or contaminants).

Finally, it is noteworthy that both Picerne and AISLIC take an "all or nothing" approach to the C & D debris: either all of it qualifies or none does. But it is possible, indeed plausible, that Picerne could prove some materials are a Pollution Condition (i.e., an object giving off methane gas) but not others (i.e., tree limbs or mulch or rocks). Admittedly, this could lead to an issue regarding how to divide Clean–Up Costs as among different buried materials, but at this stage (when fact discovery remains open for another few months and, apparently, investigation and clean-up continues) the bottom line is that grouping all the debris together as a matter of law strikes this writer as premature.

## IV. Conclusion

For the foregoing reasons, Picerne's motion for partial summary judgment on Counts I and II (Doc. No. 52) is DENIED. AISLIC's Motion for Leave to File Sur–Reply (Doc. No. 76) is DENIED as moot. Absent further proceedings or extensions, following the close of discovery on November 1, 2009 the case shall be set for trial.

It is so ordered.

---

4. Even if the Court sided with Picerne on interpretation of the coverage provision, partial summary judgment would still be denied because of the knowledge and discovery issues discussed above, and, importantly, because of same fact driven knowledge issues surrounding the potential applicability of AISLIC's "Intentional Noncompliance" exclusion.